**FUNDING SYSTEMS RAILCARS, INC., and Funding Systems Railcars Leasing, Inc., Plaintiffs-Appellees,**

v.

**PULLMAN STANDARD INC., Defendant-Appellant.**

**No. 82 C 1427.**

United States District Court, N.D. Illinois, E.D.

Sept. 1, 1983.

Lewis S. Rosenbloom, Nachman, Munitz & Sweig, Chicago, Ill., for plaintiffs-appellees.

William J. Marshall, Jr., Chicago, Ill., Peter Hearn and Michael T. Scott, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant-appellant.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

This case is before the court on Pullman Standard Inc.'s ("Pullman") appeal from an interlocutory order of the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"). That order granted a preliminary injunction prohibiting Pullman from proceeding with a lawsuit which it had filed in a federal district court in Pennsylvania. Jurisdiction in this court is based on 28 U.S.C. § 1334(b) and is not contested. Also pending is Pullman's motion to vacate the preliminary injunction. For the reasons set forth below, the decision of the Bankruptcy Court is reversed. As a result of this disposition of the case, Pullman's motion is moot.

### Statement of the Case

In August 1979, Pullman entered into a contract with the Upper Merion and Plymouth Railroad Co., Inc. ("UMP"), under the terms of which Pullman was to manufacture and sell to UMP 300 railroad boxcars. UMP, a short line railroad company incorporated in Pennsylvania and operating in that state, is a solvent, wholly-owned subsidiary of appellee Funding Systems Railcars, Inc. ("FSR"). Appellee Funding Systems Railcars Leasing, Inc. ("FSL"), is also a wholly-owned subsidiary of FSR.

On December 31, 1979, UMP accepted delivery of the first 102 boxcars. Also on that day, Pullman was informed that UMP had "assigned all of its rights under the purchase contract" to FSR. (Appendix to Pullman Standard, Inc.'s Application for Leave to Appeal, hereinafter "Appendix," at 48.) Whether UMP in fact purported to delegate its obligations under the contract to FSR, and, if so, whether Pullman consented to that delegation, are major points of contention between the parties. Those issues are important because Pullman alleges that UMP subsequently refused to accept delivery of the remaining 198 boxcars. Pullman then sold those boxcars to other purchasers and, on December 24, 1981, brought an action for breach of contract against UMP in the United States District Court for the Eastern District of Pennsylvania, seeking approximately $1,300,000 in damages.[1] UMP is the sole defendant in that action, and neither FSR nor FSL was mentioned in Pullman's complaint. The jurisdiction of the federal district court in Pennsylvania over that suit is not in dispute.

About three months before Pullman filed suit against UMP in Pennsylvania, on September 28, 1981, an involuntary case was commenced against FSR in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq.[2] FSL commenced a voluntary case in the Bankruptcy Court under Chapter 11 on October 6, 1981.[3] On January 14, 1982, FSR and FSL began an "adversary proceeding" against Pullman in the Bankruptcy Court,[4] filing a complaint and a motion for (in effect) a preliminary

---

1. Civil Action No. 81–5294.

2. 15 B.R. 611 (Bkrtcy. 81).

3. No. 81 B 12366.

4. Adversary No. 82 A 0138.

injunction seeking to prohibit Pullman from further prosecuting its suit against UMP in Pennsylvania. FSR and FSL essentially contended (and continue to contend) that Pullman's action against UMP is so closely related to their reorganization cases, and that a judgment against UMP would so directly affect their financial status, that Pullman should only be permitted to pursue its claim against UMP as part of the pending bankruptcy proceedings.

On February 2, 1982, Pullman filed a motion to dismiss FSR and FSL's complaint, and on February 23, 1982, a hearing was held before the Bankruptcy Court on the motion for a preliminary injunction and the motion to dismiss. At the close of the hearing, without explicitly stating any findings of fact or conclusions of law, the Bankruptcy Court entered a minute order denying Pullman's motion to dismiss and granting the preliminary injunction against Pullman. Pullman applied for leave to appeal from the Bankruptcy Court's interlocutory order in this court, and Judge Shadur granted the application on March 31, 1982.

### Scope of Review

Bankruptcy Rule 8013, which became effective on August 1, 1983, provides as follows:

> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Because the Bankruptcy Court made no explicit findings of fact in this case, this appeal is subject to an extremely broad scope of review.

### Conclusions of Law

Pullman's first argument on appeal is that the preliminary injunction was improperly issued because the Bankruptcy Court does not have jurisdiction over Pullman's suit against UMP. The relevant statute is 28 U.S.C. § 1471, which provides, in part, that:

> (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.
>
> (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11.
>
> (c) The bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred by this section on the district courts.

■ We note at the outset that the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 87–88, 102 S.Ct. 2858, 2879–2880, 73 L.Ed.2d 598 (1982), which held § 1471(c) unconstitutional, is clearly non-retroactive and has no effect on actions of the Bankruptcy Court completed before December 25, 1982. *See In re Martin,* 698 F.2d 883, 884 n. 1 (7th Cir.1983). Because we reverse the decision of the Bankruptcy Court in this case on other grounds, we need not consider Pullman's suggestion that *Marathon* nevertheless governs here since the preliminary injunction continues to be in effect. For purposes of this appeal, we will assume, without deciding, that Pullman's suit against UMP would fall within the "original but not exclusive" jurisdiction of the Bankruptcy Court.

Assuming that the Bankruptcy Court could exercise jurisdiction over Pullman's breach of contract action against UMP, the central question then becomes whether the Bankruptcy Court has the authority, under 11 U.S.C. § 105(a), to enjoin Pullman from pursuing its pending claim against UMP in a federal district court which also has jurisdiction over the case. Section 105(a) provides that "[t]he bankruptcy court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title." We agree with Pullman that the preliminary injunction in this case is neither "necessary" nor "appropriate," given the fact that UMP is an independent, solvent corporation which is not directly involved in the reorganization proceedings.

■ Courts have consistently held that the fact that a debtor owns all of the stock of a subsidiary does not provide a sufficient basis for a bankruptcy court to enjoin the prosecution of a suit against the subsidiary. An injunction is only proper if the debtor shows that the subsidiary is "a mere sham or alter ego" of the debtor. *In re Beck Industries, Inc.,* 479 F.2d 410, 416 (2d Cir.), *cert. denied sub nom. Trustees of Beck Industries, Inc. v. Feldman,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973). *See Parkview—Gem, Inc. v. Stein,* 516 F.2d 807, 809–811 (8th Cir.1975); *In re Adolf Gobel, Inc.,* 80 F.2d 849 (2d Cir.1936); *In re Equity Funding Corporation of America,* 396 F.Supp. 1266, 1270 (C.D.Cal.1975), *aff'd,* 519 F.2d 1274 (9th Cir.1975). Although these cases were decided before 1978, this well established rule "should remain unchanged" under the new Bankruptcy Code. 2 L. King, *Collier on Bankruptcy* ¶ 362.04, at 362–28—362–29 (15th ed. 1983). *See In re Aboussie Brothers Construction Co.,* 8 B.R. 302, 303 (D.C.E.D.Mo.1981); *In re Clifford Resources, Inc.,* 24 B.R. 778, 780 (Bkrtcy.S. D.N.Y.1982).

■ In this case, FSR and FSL do not even suggest that UMP is a sham or the alter ego of its parent. They have failed to demonstrate that UMP's status as an independent corporate entity should be disregarded. *Cf. In re Flora Mir Candy Corporation,* 432 F.2d 1060, 1062–1063 (2d Cir. 1970) (consolidation in bankruptcy presents serious dangers of unfair treatment of creditors, and should not be readily allowed). FSR and FSL's desire to facilitate their reorganization cannot take precedence over the rights of potential creditors of UMP such as Pullman. The fact that FSR owns all of the stock of UMP does not, of course, entitle FSR to treat UMP's assets as its own. Further, the Bankruptcy Court cannot shield UMP from its potential creditors in order to protect the value of the stock held by FSR. The possibly adverse impact of Pullman's suit against UMP on the debtors is not sufficient justification for the Bankruptcy Court's action in this case. *See In re Aboussie Brothers Construction Co.,* 8 B.R. at 303.

FSR and FSL's contention that UMP delegated its obligations under its contract with Pullman to FSR has no bearing on this result. *In re Unishops, Inc.,* 494 F.2d 689 (2d Cir.1974). In that case, in which the debtor claimed to have assumed the liabilities of thirteen wholly-owned subsidiaries, the Court of Appeals for the Second Circuit stated that the debtor's position that the bankruptcy court had the authority "to enjoin ... pending ... actions on the theory that the parent, and not the subsidiaries, is the real debtor, is without any legal precedent and must be rejected." *Id.* at 690. In so holding, the court pointed out that "[t]he fact that the parent may have assumed liability for the debts of its subsidiaries does not alter their corporate viability." *Id.* The court concluded that:

> [t]he subsidiaries obviously are free in those forums to present whatever defenses they may wish to urge, but to prevent such litigation in advance would constitute an extraordinary interference.... If the subsidiary companies seek the protection of the bankruptcy court ..., then, of course, they should invoke its jurisdiction.

*Id.* In the present case, the delegation defense should be asserted by UMP in the federal district court in Pennsylvania, not by FSR and FSL in the Bankruptcy Court or in this court.

FSR and FSL have cited no authorities which point to a different result in this case. We agree with Pullman that the two decisions on which they primarily rely are inapposite. In *In re Imperial "400" National, Inc.,* 429 F.2d 671 (3d Cir.1970), the federal district court in which Imperial's reorganization proceedings were pending had enjoined the appellants from going forward

with reorganization proceedings in another federal district court on behalf of a partnership in which Imperial had a 75% interest and the appellants had a 25% interest, and had transferred the latter proceedings to its district. 429 F.2d at 673. Although the court of appeals upheld the district court's order, the relationship involved was that of partner to partnership rather than, as here, parent to subsidiary. (For example, Imperial would have been liable for those debts of the partnership which could not have been satisfied out of the partnership's assets. *Id.* at 677–678.) More importantly, in *Imperial* the district court was, in effect, simply consolidating two bankruptcy proceedings; both Imperial and the partnership were debtors. In this case, on the other hand, the Bankruptcy Court enjoined an unrelated third party from proceeding with a suit against a solvent, independent corporation which happens to be a subsidiary of the debtor. *Cf. In re Equity Funding Corporation of America,* 519 F.2d 1274, 1277 (9th Cir.1975) (distinguishing *Imperial*); *In re Minton Group, Inc.,* 27 B.R. 385, 389 (Bkrtcy.S.D.N.Y.1983) (same).

*First Federal Savings & Loan Association of Little Rock v. Pettit,* 12 B.R. 147 (Bkrtcy. E.D.Ark.1981), is also easily distinguishable from the present case. In *First Federal,* the defendants were a husband and wife who had filed a personal bankruptcy petition and had submitted a reorganization plan which involved a house in which the husband's mother-in-law lived. A mortgage and promissory note on the house had been co-signed by the defendants and by the mother-in-law and her husband. Because an action against the defendants would have been automatically stayed under 11 U.S.C. § 362(a), the mortgagee sought permission to bring suit on the mortgage and promissory note against the mother-in-law and her husband, but the bankruptcy court enjoined the mortgagee from doing so. 12 Bankr. at 147. In affirming the decision of the bankruptcy court, the district court emphasized the fact that "the action to be enjoined is against a close

relative and involves a personal residence," and thus that it "might place pressure on the bankrupt[s]" to alter their reorganization plan. *Id.* at 149. The rationale for the court's decision in *First Federal* is, of course, wholly inapplicable to the case at bar, in which all of the parties involved are corporations.[5]

For the reasons stated above, the decision of the Bankruptcy Court is reversed, the preliminary injunction is vacated, and the case is remanded to the Bankruptcy Court with instructions to dismiss the adversary proceeding against Pullman.

---

**5.** Because we reverse the decision of the Bankruptcy Court for the reasons discussed, we do

not consider the other arguments presented by Pullman.